# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,

               Plaintiff,

v.

TAVARIS MICHAEL DIXON,

               Defendant.

Case No. 22-CR-151 (ECT/JFD)

**REPORT AND RECOMMENDATION**

---

This matter is before the Court on Tavaris Michael Dixon's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. No. 24) and Motion to Suppress Statements, Admissions, and Answers (Dkt. No. 25). Mr. Dixon, who is charged by indictment (Dkt. No. 14) with possession of a firearm by a prohibited person in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), claims that the police searched him and questioned him in violation of his Constitutional rights and seeks to exclude from his trial the gun that the police seized from him and the statements he made to the police. (Def.'s Mem. Supp. Mots. Suppress 1, Dkt. No. 42.) This case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.

The Court held a motions hearing on September 7, 2022. (Hr'g Tr. 1, Dkt. No. 40.)[1] Assistant United States Attorney Justin Wesley appeared on behalf of the United States (*Id.*) and called as witnesses Sergeant Adam Lepinski of the Minneapolis Police Department (*Id.* at 14:19–20) and Officer Andrew Hallberg of the Edina Police Department (*Id.* at 57:3–5). Assistant Federal Defenders Matthew Deates and Shannon Elkins appeared on behalf of Mr. Dixon (*Id.* at 1) and called as a witness Federal Defender's Office Investigator John Lageson (*Id.* at 78:19–20). The Court received post-hearing briefing from Mr. Dixon (Dkt. No. 42) and the United States (Dkt. No. 45).

Mr. Dixon was searched incident to arrest. The arrest was lawful because it was supported by probable cause. The search incident to arrest, which revealed a gun, did not exceed the allowable scope or intrusiveness of such a search. After he was in custody, but before he was given a *Miranda* warning, Mr. Dixon made two statements in response to questioning by Officer Hallberg concerning whether he had a gun. Mr. Dixon's first statement "I don't have no gun" is admissible under the public safety exception to *Miranda*, but the second, "That's not my gun," is not. A little later, Mr. Dixon stated that the gun was not stolen. Although Mr. Dixon was in custody when he made this statement, he did not make the statement in response to any action that law enforcement should have known was likely to elicit an incriminating response. Mr. Dixon's un-*Mirandized* statement that the gun was not stolen was therefore not the product of interrogation and is admissible. The

---

[1] The motions hearing transcript is currently filed under seal, but the Court has not cited to any personal identifiers or confidential information that either party requested to be redacted.

2

Court recommends that Mr. Dixon's motions be denied except as to his statement "That's not my gun."

## BACKGROUND

Sergeant Adam Lepinski of the Minneapolis Police Department stopped at an Edina convenience store to get gas and purchase an energy drink late in the afternoon of June 22, 2022. (Hr'g Tr. 24:7–25:21; 30:20–21.) Sergeant Lepinski filled his car with gas and walked into the store to buy the energy drink. (*Id.* at 25:11–17.) While in the store, Sergeant Lepinski recognized the clerk working behind the counter, Tavaris Dixon, and saw that Mr. Dixon had a pistol concealed, but not very well, under the tight, white T-shirt he was wearing. (*Id.* at 25:20–27:11.) The short interaction between the two men that afternoon led to Mr. Dixon being arrested, searched, and found to be in possession of a firearm. Because Mr. Dixon is a convicted felon, it is a violation of federal law for him to possess a firearm and a grand jury of this district indicted him for that offense. *See* 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

Sergeant Lepinski has been a licensed peace officer for 16 years and is currently assigned to a Federal Bureau of Investigation task force investigating gangs on the North Side of Minneapolis. (Hr'g Tr. 15:23–16:15; 20:24–21:7.) For over ten years, the majority of his law enforcement career, Sergeant Lepinski has been investigating guns, gangs, and narcotics. (*Id.* at 16:3–15.) He is assigned to the Minneapolis Police Department's Gun Unit. (*Id.* at 31:13.) Before becoming an FBI Task Force Officer, he had seven years of prior federal service as a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms, and Explosives. (*Id.* at 21:5–7.) During his law enforcement career, Sergeant

Lepinski has observed the behavior and appearance (particularly the gait and posture) of many individuals who were carrying a gun beneath their outer clothing, not just persons suspected of crime, but also law enforcement colleagues working in plain clothes. (*Id.* at 16:16–18:12.) As part of an investigation by the FBI task force into the "Tre Crips" gang, Sergeant Lepinski had watched Mr. Dixon rapping, under the names "Gunnaville" and "Tre Guns," in YouTube videos about firearms, about shooting members of rival gangs, and about losing friends to violence. (*Id.* at 20:12–23; 22:23–24:6; 25:22–26:4; 54:8–16.) Sergeant Lepinski had started watching these videos at least one month before spotting Mr. Dixon at the store. (*Id.* at 23:22–24:6.) Sergeant Lepinski also knew Mr. Dixon's criminal record and that because of his record, Mr. Dixon could not legally possess a firearm. (*Id.* at 23:15–21.)

As Sergeant Lepinski entered the small store, he passed close to the counter where Mr. Dixon was working, and while facing away from Mr. Dixon selected an energy drink from the coolers in the back of the store. (*Id.* at 42:5–46:24.) He then re-approached the counter, where Mr. Dixon rang up his purchase. (*Id.*) On cross-examination, Sergeant Lepinski agreed that he was in the store for 46 seconds. (*Id.* 46:20–24.) Sergeant Lepinski testified that he recognized Mr. Dixon's face, hairstyle, and tattoos from the social media videos he had watched as part of his FBI task force work. (*Id.* at 25:22–26:4; 54:4–16.) Sergeant Lepinski recalled that the store was well lit and that his view of Mr. Dixon was close and unobstructed. (*Id.* at 29:18–30:5.) The surveillance footage supports Sergeant Lepinski's testimony, showing that Sergeant Lepinski and Mr. Dixon were a few feet apart, during daylight, in a well-lit store. (Gov.'s Ex. 5 "Cashier Area" at 3:58:19–3:58:57.)

4

Sergeant Lepinski also testified that while standing at the counter he noticed that Mr. Dixon had a "very obvious bulge on the right side of his waistband," which Sergeant Lepinski characterized as "the imprint of a gun" under Mr. Dixon's "very tight," white t-shirt. (Hr'g Tr. at 26:7–27:11.) He testified that he could see the back end of the gun, including the backstrap, which is the part of a gun at the back end of the handle. (*Id.* at 27:7–28:4.) Based on his observations on June 22, as well as the knowledge he had before entering the convenience store about Mr. Dixon's gang affiliation, criminal history, and rap videos discussing "how he needs a gun and he's not going to be caught without a gun," Sergeant Lepinski concluded that the item under Mr. Dixon's t-shirt was a gun. (*Id.* 30:6–18.) Sergeant Lepinski then left the store, drove a few blocks, and asked an investigative analyst to send him a Minnesota Department of Corrections tattoo report on Mr. Dixon. Sergeant Lepinski saw that Mr. Dixon's tattoos in the report looked like the ones he had seen on the arm of the clerk in the store. (*Id.* at 49:3–16; 54:17–55:5.)

Sergeant Lepinski then called for reinforcements. (*Id.* at 31:11–32:8.) Three Edina Police Department officers, including Officer Hallberg, and one other member of the Minneapolis Police Department responded. (*Id.* 58:24–59:18.) Officer Hallberg testified that the three Edina officers entered the convenience store and saw two men in the cash register area. (*Id.* at 60:16–23.) When an officer asked one of the men his name, the man said he was Mr. Dixon. (*Id.*) The three officers then all drew their weapons and pointed them at Mr. Dixon, ordering him to put his hands up and get on his knees. (*Id.* 67:19–68:24.) Mr. Dixon complied and Officer Hallberg placed him in handcuffs. (*Id.* at 60:18–23, 67:19–68:24.) Officer Hallberg asked Mr. Dixon, "Where's the gun at?" and Mr. Dixon

replied, "I don't have no gun." (*Id.* at 62:6–13; Gov.'s Ex. 3 at 1:14–1:25.). Officer Hallberg then frisked Mr. Dixon's waistband, starting at the small of Mr. Dixon's back and then moving to the right, where he felt a "dense, heavy object within his waistband." (Hr'g Tr. 61:8–14; Gov.'s Ex. 3 at 1:18–1:22.) It was a gun, specifically a nine-millimeter Glock 48 pistol, which Officer Hallberg seized. (Hr'g Tr. at 50:21–25, 61:2–14.) Officer Hallberg then asked Mr. Dixon, "This isn't a gun?" and Mr. Dixon replied, "That's not my gun." (Gov.'s Ex. 3 at 1:18–1:22.)

After Officer Hallberg found the gun, the officers started talking about what type of gun it was, what serial number was on it, and discussed checking to see if it was stolen. (Hr'g Tr. at 74:13–76:3; Gov.'s Ex. 4 at 2:53–3:17.) This is routine information the police collect when they take custody of a firearm. (Hr'g Tr. 33:3–34:10.) Mr. Dixon turned over his shoulder to speak to the officers talking behind him, saying "It's not stolen. I know who—" (Hr'g Tr. at 75:5–21; Gov.'s Ex. 4 at 2:53–3:17.) The officers cut Mr. Dixon off, saying "That's fine, we still gotta do that." (Gov.'s Ex. 4 at 3:04–3:07.)

Mr. Dixon claims Sergeant Lepinski's observations were not sufficient under the Fourth Amendment to justify an arrest, or even a *Terry* investigative stop. (Def.'s Mem. Supp. Mot. Suppress 10.) Mr. Dixon argues that because his arrest was made without probable cause, it was unconstitutional and any evidence which is fruit of that arrest— whether statements or items found in a search—must be excluded.[2] In particular, Mr. Dixon

---

[2] The parties take opposing positions on whether Mr. Dixon's seizure was justified as an investigative stop under *Terry v. Ohio*, 392 U.S. 1, 30 (1968) followed by a limited, external pat-down for a weapon. (*Compare* Def.'s Mem. Supp. Mot. Suppress 6–10 *with* Gov.'s Mem. Opp'n Mot. Suppress 10–12.) Because the Court finds that Mr. Dixon was

claims that what Sergeant Lepinski saw under his shirt could have been a price marker or price scanner instead of a gun. (Def.'s Mem. Supp. Mot. Suppress 20–21.) Mr. Lageson, an investigator with the Federal Defender's Office with 28 years of law enforcement experience, testified in support of this claim, stating that the size of the handles of the price scanners and price marker at that store are "very similar" to that of a gun, but conceding that the top portions of the objects are "much larger and bulkier." (Hr'g Tr. 80:6–18; 81:18–82:20; 85:12–20; 86:22–25.) Mr. Dixon further claims that the statements he made to Officer Hallberg ("I don't have no gun" and "That's not my gun,") as well as the statement he made when he heard officers discussing checking to see if the gun was stolen, ("It's not stolen. I know who—") were the result of un-*Mirandized* custodial interrogation conducted in violation of the Fifth Amendment. (Def.'s Mem. Supp. Mot. Suppress 25–29.)

The Court recommends that Mr. Dixon's motion to suppress the firearm be denied because the police had probable cause to make a warrantless felony arrest of Mr. Dixon in a public place. *United States v. Watson*, 423 U.S. 411, 421–24 (1976). Once the police arrested Mr. Dixon, they were allowed to search Mr. Dixon incident to that arrest. *Chimel v. California*, 395 U.S. 752, 762–63 (1969). Their search did not exceed the bounds of a proper search incident to arrest. As to Mr. Dixon's challenge to his statements, the Court recommends denying Mr. Dixon's motion as to the statements "I don't have no gun" and "It's not stolen. I know who—" Although both these statements were made before Mr.

---

constitutionally arrested, the investigative stop issue need not be discussed, except to observe that if the higher constitutional standard for a custodial arrest is satisfied, then the lower standard for an investigative stop is also satisfied.

Dixon had been given a *Miranda* warning, the first statement is within the scope of the public safety exception of *New York v. Quarles* to the *Miranda* warning requirement. *See New York v. Quarles*, 467 U.S. 649, 655 (1984). The second statement was not made in response to police questioning. Rather, the police were standing behind Mr. Dixon, discussing the next steps to take when Mr. Dixon spontaneously interjected that the gun was not stolen. (Gov.'s Ex. 4 at 2:53–3:17.) The Court recommends granting, however, Mr. Dixon's motion to suppress statements as to his remark "that's not my gun." This statement was also not preceded by a *Miranda* warning, but unlike the immediately preceding statement, "I don't have no gun," there was no public safety exigency allowing its admission. Concerns about public safety arising from an unlocated firearm no longer existed, because by the time Mr. Dixon said "That's not my gun" the police had found and seized the gun.

## ANALYSIS

### A. THE ARREST AND SEARCH OF MR. DIXON WERE CONSTITUTIONAL.

#### 1. Legal Standards Applicable to a Search Incident to a Warrantless Arrest.

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. A search conducted without a search warrant issued by a neutral and detached judicial officer is presumptively unreasonable unless the search is justified by one of a few well-recognized exceptions to the Warrant Clause. *Arizona v. Gant*, 556 U.S. 332, 338 (2009) ("[O]ur analysis begins, as it should in every case addressing the reasonableness of a warrantless search, with the basic rule that 'searches conducted outside the judicial

process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnote omitted))). If the United States seeks to justify a warrantless search by asserting that the search fell within one of the exceptions to the Fourth Amendment's Warrant Clause, it bears the burden of showing (1) the need for an exception from the warrant requirement and (2) that the challenged conduct of law enforcement fits within that exception. *United States v. Riedesel*, 987 F. 2d 1383, 1388 (8th Cir. 1993).

A search incident to a lawful, custodial arrest is a well-recognized exception to the warrant requirement. *Chimel v. California*, 395 U.S. 752, 762–63 (1969) ("When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape" and "to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.")[3]; *United States v. Robinson*, 414 U.S. 218, 235 (1973) ("A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification.") The validity of a search incident to arrest is dependent

---

[3] In *Arizona v. Gant*, the Supreme Court abrogated *Chimel* in part, tightening the limits on searches of motor vehicles conducted under the authority of the search incident to arrest exception. *See Davis v. United States*, 564 U.S. 229, 232–35 (2011) (describing this doctrinal shift). *Gant* left untouched the holding of *Chimel* quoted above, that a lawful arrest authorizes a search incident to that arrest. The search in the case at bar is not of a motor vehicle but of Mr. Dixon's person.

on the validity of the underlying arrest under federal law. *United States v. Lewis*, 183 F.3d 791, 793–94 (8th Cir. 1999); *United States v. Bell*, 54 F.3d 502, 504 (8th Cir. 1995).

The Eighth Circuit has held that "[a] warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause." *United States v. Guevara*, 731 F.3d 824, 832 (8th Cir. 2013) (quoting *Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1059 (8th Cir. 2013) (in turn quoting *Borgman v. Kedley*, 646 F.3d 518, 522–23 (8th Cir. 2011))). "Probable cause to make a warrantless arrest exists 'when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'" *Ulrich*, 715 F.3d at 1059 (quoting *Borgman*, 646 F.3d at 523). Once probable cause exists to believe a suspect has committed a felony, police can arrest a suspect without a warrant in a public place. *United States v. Watson*, 423 U.S. 411, 421–24 (1976).

### 2.  Mr. Dixon's Arrest was Supported by Probable Cause.

Mr. Dixon claims that he was arrested without probable cause, invalidating the search that immediately followed his arrest because although it was incident to an arrest, it was not incident to a lawful arrest. (Def.'s Mem. Supp. Mot. Suppress 5.) The Court disagrees. Applying the above legal standards to the facts of this case shows that Mr. Dixon's felony arrest in a public place was supported by probable cause. The search following his arrest was therefore valid.

Sergeant Lepinski, as noted above, had 16 years of law enforcement experience, and had spent more than ten of those years investigating guns, drugs, and gangs in Minneapolis. He had ample experience in assessing the likelihood that a person was carrying a concealed

firearm. He observed not just a suspicious bulge on Mr. Dixon, but he could actually visualize, through Mr. Dixon's tight t-shirt, part of the handgrip of a pistol and part of the slide and barrel of a pistol. (Hr'g Tr. 27:23–28:4, 36:11–38:20.) At the time, Sergeant Lepinski was assigned to an FBI task force and as part of his duties with that task force, he had watched YouTube videos, starring Mr. Dixon, in which Mr. Dixon rapped about guns, gangs, and the loss of friends to violence. Sergeant Lepinski knew Mr. Dixon's criminal record and knew that it disqualified him from legally possessing a firearm. In between the time Sergeant Lepinski saw Mr. Dixon at the convenience store and the time Mr. Dixon was arrested, Sergeant Lepinski checked the tattoos he had seen on Mr. Dixon against Minnesota Department of Corrections records and observed that the tattoos on Mr. Dixon were consistent with those attributed to him by the DOC. The Court observed Sergeant Lepinski when he testified and finds Sergeant Lepinski's testimony credible.

Against this, Mr. Dixon asserts that Sergeant Lepinski's testimony was not believable in several regards, but none of these assertions, singly or in combination, are persuasive to the Court. Mr. Dixon claims that Sergeant Lepinski only spent 16 of the 46 seconds he spent in the store face-to-face with Mr. Dixon, and that this time was too short to allow Sergeant Lepinski to accurately identify him. (Def.'s Mem. Supp. Mot. 12–14.) Mr. Dixon overlooks that 16 seconds is actually far longer than is needed to identify a person known to the observer. Mr. Dixon was known to Sergeant Lepinski, who had been watching YouTube videos of Mr. Dixon for a month before meeting Mr. Dixon in the convenience store. In addition, Sergeant Lepinski and Mr. Dixon were only feet apart, in a well-lit place. As the United States points out in its post-hearing brief, at checkout Mr.

Dixon's right hip (the hip where Officer Hallberg later found the gun) was closest to Sergeant Lepinski. (Gov.'s Mem. Opp'n Mot. Suppress 3–4.) Nor was this face-to-face meeting all that Sergeant Lepinski based his conclusion on. The Court observes, on security camera footage, what appear to be tattoos on Mr. Dixon's bare left forearm. (Gov.'s Ex. 5 "Cashier Area" at 3:58:46–3:58:56; *see also* Gov.'s Ex. 3 at 1:21–3:23 (for view of tattoos on both forearms and biceps).) Sergeant Lepinski's testimony that he consulted a Department of Corrections tattoo report on Mr. Dixon, from which he was able to confirm that the tattoos he had seen on the clerk were the same as the tattoos on Mr. Dixon, also supports the Court's conclusion that probable cause existed, under the standard above, to arrest for the crime of possession of a firearm by a prohibited person.

Mr. Dixon also asserts that the item Sergeant Lepinski saw could have been either a bar code scanner or a price marker, both items in use in retail stores such as the one where Mr. Dixon was employed. Before becoming a police officer, Sergeant Lepinski had worked at a large retail chain, and was familiar with both bar code scanners and price markers. (Hr'g Tr. 28:16–29:17.) When asked about the possibility that these tools of the retail trade could account for what he saw, Sergeant Lepinski testified that it was a gun he saw in Mr. Dixon's waistband. (*Id.* at 29:11–16, 31:6–9.) A Federal Defender's investigator with many years of law enforcement experience testified for Mr. Dixon, and through him, five photographs were introduced into evidence of the bar code scanners and price markers used at the convenience store where Mr. Dixon worked. (*Id.* at 56:23–57:2, 81:18–82:10.) The investigator, however, conceded on cross-examination that, while the lower portion of

these innocuous items could appear similar to a pistol, the top portion was distinctly different. (*See* 85:12–20; 86:22–25.)

Mr. Dixon argues that a line of Eighth Circuit cases from the drug interdiction context requires an officer's "initial observation of a concealed bulge to be buttressed by a *permissible* touching of the bulge, which then may give rise to probable cause *if* touching the bulge makes the presence of contraband 'immediately apparent.'" *United States v. Aquino*, 674 F.3d 918, 924 (8th Cir. 2012) (citing *United States v. Favela*, 247 F.3d 838, 840 (8th Cir. 2001); *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)); (Def.'s Mem. Supp. Mot. Suppress at 22). The United States retorts that this line of cases is inapposite because the defendants in those cases were unknown to law enforcement, unlike here, where law enforcement knew Mr. Dixon's appearance, knew he could not legally possess a gun, and saw the "imprint of a gun" under his tight t-shirt. (Hr'g Tr. 27:7; Gov.'s Mem. Opp'n Mot. Suppress at 9–10.) The Court agrees with the United States. Sergeant Lepinski's knowledge and observations alone provided law enforcement probable cause to arrest Mr. Dixon, well before Officer Hallberg patted him down and searched him incident to arrest.

Sergeant Lepinski's observations of Mr. Dixon, in combination with the knowledge he had gained through investigation about Mr. Dixon's appearance, were sufficient to allow him to reliably identify Mr. Dixon. The same observations, plus Sergeant Lepinski's viewing of Mr. Dixon's YouTube videos and knowledge of Mr. Dixon's criminal record, were sufficient to give Sergeant Lepinski probable cause to believe that Mr. Dixon was in

13

illegal possession of a firearm. The arrest of Mr. Dixon was supported by probable cause. Law enforcement was entitled to search Mr. Dixon incident to his arrest.

### 3. The Search of Mr. Dixon Incident to his Arrest was Conducted Properly.

A search incident to arrest may include, at a minimum, a search of the arrestee's person for weapons and evidence. *Chimel v. California*, 395 U.S. 752, 762–63 (1969); *Basham v. United States*, 811 F. 3d 1026, 1028 (8th Cir. 2016) ("As a general matter, in a search incident to arrest, police officers are allowed to search not only an arrestee's person for weapons, but also for evidence. . . ."). In this case, of course, the recovered firearm is both a weapon and evidence.

Officer Hallberg testified that after handcuffing Mr. Dixon he placed his hand on Mr. Dixon's back at waistband level, then swept his hand to Mr. Dixon's right side, where he encountered a hard object. When Officer Hallberg removed the hard object, he saw it was a gun. Officer Hallberg's body camera footage confirms his testimony. (Gov.'s Ex. 3 at 1:12–1:23.) Officer Hallberg's search was of Mr. Dixon's person, which is within the limits set for a search incident to arrest. The gun was therefore discovered during a constitutional search conducted incident to a constitutional arrest. The Court recommends that the defense motion (Dkt. No. 24) to suppress the gun be denied.

### B. THE STATEMENTS

### 1. Questions Asked Under the Public Safety Exception to *Miranda*.

#### a. The Legal Standards Applicable to Non-*Mirandized*, Custodial Interrogation Under the Public Safety Exception of *New York v. Quarles*.

The Fifth Amendment provides that "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const., Amend. V. In *Miranda v. Arizona* the Supreme Court held that "statements obtained from an individual who is subjected to custodial police interrogation" are not admissible at trial unless law enforcement has followed "procedures which assure that the individual is accorded his privilege under the Fifth Amendment not to be compelled to incriminate himself." 384 U.S. 436, 439, 467 (1966). In particular, a person who is in custody and being questioned "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 479. If these warnings are not given, the prosecution may not use the statements. *Id.*

Mr. Dixon asserts that he was in custody when Officer Hallberg asked him "Where's the gun at?" and "This isn't a gun?" and the United States does not contest that claim. (Def.'s Mem. Supp. Mot. Suppress 24–25; Gov.'s Mem. Opp'n. Mot. Suppress 12–13.) Nor does the United States dispute that it was Officer Hallberg who initiated the questioning, or that Mr. Dixon had not been given a *Miranda* warning at the time Officer Hallberg asked these questions. (Gov.'s Mem. Opp'n. Mot. Suppress 12–13.) All the conditions requiring a *Miranda* warning have therefore been met, and the responses Mr. Dixon gave to Officer Hallberg's two questions must be suppressed unless an exception to *Miranda*'s requirements excuses officers for not giving Mr. Dixon a warning before

questioning. *Miranda*, 384 U.S. at 479. Such an exception exists, in the form of the public safety exception to *Miranda*.

     *Miranda's* "doctrinal underpinnings" do not "require that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety." *New York v. Quarles*, 467 U.S. 649, 656 (1984). In *Quarles*, a woman reported to two New York City officers on patrol that she had been sexually assaulted, gave a description of her assailant, told the officers the suspect had just run into a nearby grocery store, and told the officers the man had a gun. *Id.* at 651–52. One of the officers ran into the store and spotted the suspect, Benjamin Quarles. In a chase inside the store, the officer lost sight of Quarles for several seconds. *Id.* at 652. When the officer caught up to Quarles and restrained him, the officer found Quarles was wearing an empty shoulder holster. (*Id.*) After handcuffing Quarles, the officer asked him the same question Officer Hallberg asked in this case, "Where's the gun?" *Id.* at 652; *see also id.* at 675 (J. Marshall, dissenting.) (using direct quote). Quarles indicated the gun's location and the officer recovered it. *Id.* at 652. The *Quarles* court held that notwithstanding that Quarles had been questioned by law enforcement while in custody without first being given a *Miranda* warning, neither the response Quarles gave to the police officer's question, nor the gun, needed to be suppressed. "So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety . . . ." *Id*. at 657. Questions "circumscribed by the exigency which justifies [them]" need not be preceded by a *Miranda* warning. *Id.* at 658.

When Officer Hallberg asked, "Where's the gun at?" he had not yet found the gun in Mr. Dixon's waistband. (Gov.'s Ex. 3 at 1:12–1:23.) Officer Hallberg testified that Sergeant Lepinski had not told him where on Mr. Dixon's person the gun was (Hr'g Tr. 61:22–24), and the defense itself points out, in its post-hearing brief, that nearly an hour went by between the time Sergeant Lepinski saw Mr. Dixon and the time Officer Hallberg placed handcuffs on Mr. Dixon (Def.'s Mem. Supp. Mot. Supp. at 3), enough time for Mr. Dixon to have moved the gun to the other side of his body, to a pocket, to another person, or to somewhere in the store and not on his person. *United States v. Newton*, 369 F.3d 659, 678 (2nd Cir. 2004) (holding the possibility that a gun had been moved since the police first learned of it was part of the justification for application of the public safety exception). As in *Quarles*, a gun was missing inside a store; as in *Quarles,* a police officer asked a handcuffed and surrounded suspect "Where's the gun at?"; and as in *Quarles,* the response to that question is admissible, even though it was not preceded by a *Miranda* warning.

The defense, citing Judge Gruender's concurring opinion in *United States v. Liddell*, 517 F. 3d 1007, 1010–13 (2008) (Gruender, J., concurring), asserts that the Eighth Circuit has departed from *Quarles*'s tethering of the public safety exception to exigent circumstances by allowing public safety questioning when no true danger to the public exists (Def.' Mem. Supp. Mot. Suppress at 27). While defendant Liddell was handcuffed and in the back seat of a squad car, police officers searched his car. *Liddell*, 517 F. 3d at 1008. When the officers found a revolver, they asked Liddell whether there was anything else in the car that might hurt them. Liddell did not answer that question directly, but referencing the revolver the police had just found, acknowledged, "I knew it was there . . .

but it's not mine." *Id.* Liddell then told the officers there were no other weapons in the car. *Id.* The Eighth Circuit affirmed the district court's holding that the public safety exception controlled. *Id.* at 1009–10. Mr. Dixon uses *Liddell* as an example of the Court of Appeals allowing statements into evidence pursuant to the public safety exception even when a defendant cannot possibly gain access to the firearm, but the defense's concession that *Liddell* is "binding precedent" quickly terminates this argument. (Def.'s Mem. Supp. Mot. Suppress at 27.)

The Court will also observe that in this case there was at least one other civilian (another employee) inside the store (Hr'g Tr. 60:13–23), and that the missing gun also posed a threat to the officers if they found it unexpectedly or mishandled it in some way, *Liddell*, 517 F. 3d at 1009. Benjamin Quarles was also in handcuffs and surrounded by multiple police officers when one of them asked, "Where's the gun?" *Quarles*, 467 U.S. at 655. Because the public safety exigency was more the fact that Quarles's gun was missing, less the apprehension that Quarles might get his hands on it, the public safety exigency still existed when the police asked him for the location of his gun. *Id.* at 657.

Officer Hallberg's question "Where's the gun at?" was, as required by *Quarles* and its progeny, "circumscribed by the exigency which justifie[d] it." *Id.* at 658. The Court recommends that the portion of Mr. Dixon's motion seeking suppression of his statement in response to Officer Hallberg's first question be denied and that the statement be allowed into evidence.

The Court follows the same analysis, but reaches the opposite conclusion, as to Mr. Dixon's response to Officer Hallberg's second question, "This isn't a gun?" Because the

*Quarles* public safety exception to *Miranda* is "circumscribed by the exigency which justifies it," when there is no longer a public safety exigency the exception becomes unavailable. When Officer Hallberg asked his second question, he had seized the gun from Mr. Dixon's right hip, and by doing so, ended the threat to public safety. When Officer Hallberg asked his second question, Mr. Dixon was in custody, being questioned, and had not been given a *Miranda* warning. The United States does not proffer any exception other than the public safety exception that would spare Mr. Dixon's response to Officer Hallberg's second question from suppression, nor is the Court aware of one. (Gov.'s Mem. Opp'n Mot. Suppress 12–13). The Court is aware that public safety questions must be "framed spontaneously in dangerous situations" by the police and that "precision crafting" of public safety questions should not be required of law enforcement. *United States v. Newton*, 369 F.3d 659, 678 (2004). But Officer Hallberg's second question was not even a true public safety question, such as whether there were other guns in the convenience store. Since the public safety exception no longer applied by the time the second question was asked, Mr. Dixon's response to that question is not admissible.

When faced with a mixture of admissible and inadmissible questioning under the public safety exception, the District of Minnesota has allowed the responses to permitted questions into evidence while suppressing the responses to unpermitted questions. *United States v. Rogers*, No. 13-CR-130, 2013 WL 6388457, at *4–5 (ADM/JJG) (D. Minn. Dec. 6, 2013). This Court will do the same and recommend that the response to "Where's the gun at?" be permitted into evidence, but that the response to "This isn't a gun?" be suppressed.

## 2. The Statement Made in Apparent Response to a Discussion Among Police Officers that Mr. Dixon Overheard.

The Supreme Court has held that "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301 (1980). In *Innis*, as in this case, a conversation between police officers in the presence of an in-custody defendant led to the defendant interjecting with some words of his own.[4] *Id.* at 295. After deciding that they could not "say that the officers should have known that it was reasonably likely that Innis" would make incriminating statements in response to their "off hand remarks," the Supreme Court ruled the statements admissible. *Id.* at 303.

In this case, several facts make clear to the Court that the conversation among police officers inside the convenience store was not action that the police should have known would lead to any response at all, much less an incriminating response, from Mr. Dixon. The body camera footage shows Mr. Dixon with his back to the officers; the police officers are having their discussion and one officer is holding a walkie talkie to his mouth; police are discussing the routine steps they take whenever the police take custody of a firearm; and most importantly, the police did not take advantage of the opportunity to gain

---

[4] That the officers in *Innis* did not direct their remarks to the defendant distinguishes *Innis* (and this case) from *Brewer v. Williams*, 430 U.S. 387, 392–93 (1977) in which police officers directed to the defendant their statements about the importance of giving a murdered child a "Christian burial."

information, but actually cut Mr. Dixon off mid-sentence, telling him "That's fine, we still gotta do that." (Gov.'s Ex. 4 at 2:53–3:17.)

Mr. Dixon was in custody when the police spoke among themselves about the sequence of events in their investigation, but he was not being interrogated. Since *Miranda* is only triggered when a suspect is both in custody and being interrogated, *Miranda* did not apply to this situation, and the absence of a *Miranda* warning does not require suppression. *Innis*, 446 U.S. at 300 ("[T]he special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation."). The Court recommends denying the portion of Mr. Dixon's motion seeking suppression of his spontaneous interjection into a conversation that multiple police officers were having nearby.

### 3. Other Statements

At the motions hearing, the Assistant United States Attorney put on the record that the defense and the prosecution have stipulated to the inadmissibility of certain statements made by Mr. Dixon in a Minneapolis officer's squad car while being transported, except for the limited purpose of impeachment. (Hr'g Tr. 11:24–12:25.) These statements are not before the Court, and there is no motion pending as to them. The stipulation is part of the record. (*Id.*)

### CONCLUSION

Therefore, based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Mr. Dixon's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. No. 24) be **DENIED**, and

2. Mr. Dixon's Motion to Suppress Statements, Admissions, and Answers (Dkt. No. 25) be **GRANTED IN PART AND DENIED IN PART AS DESCRIBED ABOVE**.

Date: November 28, 2022              *s/ John F. Docherty*
                                     JOHN F. DOCHERTY
                                     United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.

A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).