UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| United States of America, | File No. 22-cr-151 (ECT/JFD) |
| Plaintiff, | |
| v. | **ORDER ACCEPTING REPORT AND RECOMMENDATION** |
| Tavaris Michael Dixon, | |
| Defendant. | |

---

Defendant Tavaris Michael Dixon objects to those parts of a Report and Recommendation [ECF No. 46] issued by Magistrate Judge John F. Docherty recommending the denial of Dixon's motion to suppress evidence obtained through a search and seizure [ECF No. 24] and the partial denial of Dixon's motion to suppress statements [ECF No. 25]. ECF No. 47. This order presumes familiarity with the Report and Recommendation. Because Dixon has objected, the Court is required to review the Report and Recommendation de novo pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.2(b)(3). Magistrate Judge Docherty's recommendations will be accepted.

I

Dixon objects to Magistrate Judge Docherty's conclusion that officers had probable cause to arrest Dixon without a warrant. ECF No. 47 at 5. "A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause." *United States v. Guevara*, 731 F.3d 824, 832 (8th Cir. 2013). "Probable cause to make a warrantless arrest exists 'when the totality of the circumstances at the time of the arrest are sufficient

to lead a reasonable person to believe that the defendant has committed or is committing an offense.'" *Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1059 (8th Cir. 2013) (quoting *Borgman v. Kedley*, 646 F.3d 518, 522–23 (8th Cir. 2011)). Put another way, "[p]robable cause for a warrantless arrest depends upon whether, at the moment the arrest was made, the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *United States v. Tovar-Valdivia*, 193 F.3d 1025, 1028 (8th Cir. 1999) (cleaned up). Once police have probable cause to believe a suspect has committed a felony, they can arrest the suspect without a warrant in a public place. *United States v. Watson*, 423 U.S. 411, 421–24 (1976).

To summarize, Magistrate Judge Docherty concluded that probable cause supported Dixon's arrest based essentially on Sergeant Lepinski's extensive experience, including "ample experience in assessing the likelihood that a person was carrying a concealed firearm[,]" his prior investigation and knowledge of Dixon, his observations of Dixon in the convenience store, and work Sergeant Lepinski undertook after leaving the store to confirm Dixon's identity before the arrest. ECF No. 46 at 10–11. Magistrate Judge Docherty "observed Sergeant Lepinski when he testified and [found] Sergeant Lepinski's testimony credible." *Id.* at 11.

Dixon argues that Sergeant Lepinski lacked sufficient time to identify him. ECF No. 47 at 5–13. Sergeant Lepinski interacted with Dixon for 16 seconds. Prior to this interaction, "Sergeant Lepinski was assigned to an FBI task force and as part of his duties with that task force, he had watched YouTube videos, starring Mr. Dixon, in which Mr.

2

Dixon rapped about guns, gangs, and the loss of friends to violence." ECF No. 46 at 11. "Sergeant Lepinski knew Mr. Dixon's criminal record and knew that it disqualified him from legally possessing a firearm." *Id.* And the record shows that the two men interacted in a well-lit space. *See* ECF No. 36 at 29–30. Certainly under these circumstances, the 16 seconds Sergeant Lepinski interacted with Dixon was more than enough time for an identification.

Notwithstanding Magistrate Judge Docherty's credibility determination, Dixon argues that Sergeant Lepinksi's testimony lacks credibility because Sergeant Lepinski "failed to describe [Dixon's tattoos] for the Court." ECF No. 47 at 11. This argument implies that Sergeant Lepinski was asked to describe Dixon's tattoos. He was not. Sergeant Lepinski described how, after his brief interaction with Dixon, he went back to his squad car and had his intel analyst send him Dixon's tattoo report from the Department of Corrections. ECF No. 36 at 54–55. Sergeant Lepinski then compared the tattoos in the DOC tattoo report to what he had just seen on Dixon minutes earlier in order to confirm his identification. *Id.* On this record, a description of Dixon's tattoos was not necessary to establish probable cause, and the absence of this description does not undermine Magistrate Judge Docherty's finding that Sergeant Lepinski testified credibly.

Dixon advances a series of similar challenges that are not persuasive for similar reasons. He questions how Sergeant Lepinski could have identified him because the Sergeant was investigating "numerous different gangs" during that time. *Id.* But Sergeant Lepinski also testified that he had investigated Dixon specifically, and if the Sergeant's larger investigation might have risked somehow diluting his particular knowledge

3

concerning Dixon, the record does not reflect that occurred. Dixon argues that Sergeant Lepinski's failure to quote Dixon's song lyrics raises doubt regarding his familiarity with Dixon. Sergeant Lepinski was not asked to quote Dixon's lyrics. Dixon points out that Sergeant Lepinski watched more videos of Dixon after the arrest and argues this additional investigative work shows that the Sergeant lacked a basis to identify Dixon before the arrest. ECF No. 47 at 11–12. Dixon is correct that whatever videos Sergeant Lepinski watched post-arrest cannot contribute to showing the presence of probable cause. The problem with this argument is that it does not show that Sergeant Lepinski's pre-arrest investigation was somehow insufficient, and the Sergeant's description of his pre-arrest knowledge was not shown to depend improperly on some aspect of his post-arrest investigation.

Dixon purports to quote the hearing transcript to argue that Magistrate Judge Docherty overstated the time Sergeant Lepinski said he spent watching Dixon's "Gunnaville" and "Tre Gunz" music videos on YouTube before the arrest. *See* ECF No. 47 at 12. Dixon writes:

> The officer testified that he had watched the videos "at least a month prior" to Mr. Dixon's arrest on June 22, 2022. The R&R took this to mean the officer "had been watching YouTube videos of Mr. Dixon for a month before meeting Mr. Dixon in the convenience store." This improperly implies that Sgt. Lepinski had been systematically watching YouTube videos for an entire month before Mr. Dixon's arrest . . . .

ECF No. 47 at 12 (citations omitted). This quotation is misleadingly incomplete. It omits the word "*started*" from Sergeant Lepinski's testimony. ECF No. 36 at 23–24 ("I would

4

say I *started* watching the videos at least a month prior . . . .") (emphasis added). The complete transcript amply supports Magistrate Judge Docherty's findings in this regard.

Dixon argues that Sergeant Lepinski lacked a reasonable basis to believe Dixon was armed. *Id.* at 13. Dixon notes that although Sergeant Lepinski testified about "certain indicators" that he'd been trained to look for in deciding whether someone may be armed, the only applicable indicator here was the "bulge" in Dixon's waistband. *Id.* at 14–15. Sergeant Lepinski himself noted in his testimony that the typical indicators, such as a suspect favoring one side while walking, or seeing their clothing swing, did not apply to this situation because Dixon was working behind the store counter and was not mobile. ECF No. 36 at 55–56. This does not negate the fact that Sergeant Lepinski, with 16 years of experience as a peace officer, and over 10 years of experience investigating guns, gangs, and narcotics, saw an imprint of a gun under Dixon's tight t-shirt from "a couple feet" away. *Id.* at 26–29 ("It wasn't a bulge. It was an imprint of a gun."). Dixon further argues that the backstrap of the gun, which was in view of Sergeant Lepinski, bears similarities to other items in the store, such as barcode scanners and price markers. *Id.* at 18–22. Sergeant Lepinski himself has retail experience and familiarity with those items, and he testified that the object he was seeing was not at all consistent with those items. *Id.* at 29 ("Those objects are way too thick and the part of those objects that stick off the back from the handle was not at all consistent with what I was seeing in Mr. Dixon's waistband."). The difference in thickness and shape between a handgun and a barcode scanner is readily apparent in the photos provided by Dixon, and was conceded by Mr. Lageson, an investigator with the

Federal Defender's Office. ECF No. 47 at 19–20; ECF No. 36 at 86–87 (Investigator Lageson noting that, compared to a firearm, price scanners are "much larger and bulkier").

Magistrate Judge Docherty correctly determined that probable cause existed. As Dixon's Fourth Amendment rights were not violated, the evidence obtained from Dixon is not the fruit of an illegal seizure and will not be suppressed. *See Brown v. Illinois*, 422 U.S. 590, 602–03 (1975).

II

Dixon objects to Magistrate Judge Docherty's recommendation that two of Dixon's post-arrest statements not be suppressed under *Miranda*. ECF No. 47 at 24. The Report and Recommendation found that (1) Dixon's response to Officer Hallberg's question of, "Where's the gun at?" need not be suppressed under the public-safety exception to *Miranda*, ECF No. 46 at 16–18; and (2) Dixon's response to the officers' discussion about checking the gun's serial number to see if it was stolen need not be suppressed because it was not the product of police interrogation, *id.* at 20–21.

The Fifth Amendment provides that "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. Under *Miranda v. Arizona*, "statements obtained from an individual who is subjected to custodial police interrogation" are not admissible at trial unless law enforcement has followed "procedures which assure that the individual is accorded his privilege under the Fifth Amendment not to be compelled to incriminate himself." 384 U.S. 436, 439, 467 (1966). Prior to this questioning, a person who is in custody and being questioned must be provided a warning that they have a right to be silent, that anything they say can be used against them in a court

6

of law, that they have the right to the presence of an attorney, and that if they cannot afford an attorney, one will be appointed for them before any questioning if they so desire. *Id.* at 479. If the *Miranda* warnings are not given, the prosecution may not use the statements. *Id.* "Custody occurs either upon formal arrest or under any other circumstances where the suspect is deprived of his freedom of action in any significant way." *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990). Interrogation involves "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). That said, "[t]he doctrinal underpinnings of Miranda do not require that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety." *New York v. Quarles*, 467 U.S. 649, 650 (1984). This is otherwise known as the public safety exception.

Dixon argues that the public safety exception should not apply to the admissibility of his response to Officer Hallberg's question of "Where's the gun at?" ECF No. 47 at 25. Dixon had not been given a *Miranda* warning at that time, and replied, "I don't have no gun." ECF No. 36 at 62; ECF No. 47 at 24. He claims that there was no threat to public safety because he was on his knees, in handcuffs, and surrounded by armed officers. ECF No. 36 at 26. Magistrate Judge Docherty correctly determined that the public safety exception, as explained in *New York v. Quarles*, applies here. *See* ECF No. 46 at 16 (citing *Quarles*, 467 U.S. at 658). As discussed in *Quarles*, a case in which a suspect was similarly in custody when questioned, a concealed firearm can pose more than one danger to the public safety. 467 U.S. at 657 ("So long as the gun was concealed somewhere in the

7

supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety."). Further, as noted by Magistrate Judge Docherty, at least one other civilian was in the store. *See* ECF No. 46 at 18.

Dixon also argues that another post-arrest statement should be suppressed. Upon hearing the arresting officers discuss among themselves the next steps in their investigation, including "running the gun" to see if it was stolen, Dixon interjected, "It's not stolen. I know who . . . ." ECF No. 47 at 24; ECF No. 36 at 75. The officers cut him off mid-sentence, stating, "That's fine, we still gotta do that." ECF No. 46 at 20–21 (citing Gov.'s Ex. 4 at 2:53–3:17). Dixon claims that the officers' discussion was "reasonably likely to elicit an incriminating response" and thus constituted an interrogation. ECF No. 47 at 28 (citing *Innis*, 446 U.S. at 301). This is incorrect. The officers' discussion was not an action they should have known would lead to an incriminating response by Dixon. The officers were discussing routine procedures police follow when taking custody of a firearm and did not direct their remarks to Dixon. The body language of all parties, with Dixon facing away from the officers, further indicates that this was not an interrogation. Nor did the police take advantage of their opportunity to gain information, and instead cut Dixon off before he could make any more statements. *Id.* at 20–21. Accordingly, these statements will not be suppressed.

Based on the foregoing, and on all the files, records, and proceedings in this matter,

**IT IS ORDERED THAT**:

1. The Objections to the Report and Recommendation [ECF No. 47] are **OVERRULED**;

2. The Report and Recommendation [ECF No. 46] is **ACCEPTED** in full;

3. Dixon's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [ECF No. 24] is **DENIED**;

4. Dixon's Motion to Suppress Statements, Admissions, and Answers [ECF No. 25] is **GRANTED IN PART AND DENIED IN PART** as described in the Report and Recommendation.

Dated: January 13, 2023                s/ Eric C. Tostrud
                                       Eric C. Tostrud
                                       United States District Court